IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| KERRY MARSHALL | : | NO. 00-385 |

### MEMORANDUM

Padova, J.                                                                                      March 14, 2022

This action arises out of Petitioner Kerry Marshall's conviction for conspiracy to receive explosives in violation of 18 U.S.C. § 844(n).  Presently before the court is Marshall's "Motion to Reduce Sentence pursuant to 18 U.S.C. § 3582(c)(1)."  Marshall filed this Motion after the Pennsylvania state court vacated his life without parole sentence for crimes he committed when he was a minor, following the United States Supreme Court's ("Supreme Court") directives in Miller v. Alabama, 567 U.S. 460 (2012), and Montgomery v. Louisiana, 577 U.S. 190 (2016).  Marshall now argues that the unconstitutional state sentence imposed upon him as a minor and subsequent long-term periods in solitary confinement, which had psychological repercussions that led to his federal crime, in combination with his significant efforts towards rehabilitation, constitute extraordinary and compelling circumstances for compassionate release under the First Step Act of 2018 ("FSA").  He also seeks release based on his medical conditions and the COVID-19 pandemic.

We held argument on Marshall's Motion on December 15, 2021.  For the reasons that follow, we now grant the Motion in part and defer it in part.  Specifically, we grant the Motion insofar as it seeks a determination that Marshall has established an extraordinary and compelling

reason for relief, but defer the Motion insofar as it seeks a sentence reduction and, instead, schedule a hearing for consideration of the sentencing factors under 18 U.S.C. § 3553(a).

## I.   BACKGROUND

### A.   Marshall's State Homicide Conviction

On November 2, 1988, 17-year-old Marshall and his 14-year-old accomplice climbed aboard a fish truck and attempted an armed robbery. The driver, Susan Richardson, drew her gun in defense, and she and Marshall exchanged shots. Marshall was struck in the hand and Ms. Richardson was shot in the chest. Ms. Richardson eventually died of her wound. On March 6, 1990, Marshall was found guilty of first-degree murder, recklessly endangering another person (two counts), robbery, possession of an instrument of crime, and criminal conspiracy. He was sentenced to a mandatory sentence of life without the possibility of parole ("LWOP").

### B.   Marshall's First Decade of Confinement

Marshall was diagnosed with antisocial personality disorder in 1990 shortly after entering prison. (Presentence Investigation Report ("PSR") ¶ 42.) In prison, he would often hurt guards or other inmates. (See Pet'r's Medical Records ("Med. Records"), Pet'r's Ex. J (Docket No. 110), at 2, 4.) A psychological report prepared in 1995 concluded: "Mr. Marshall's thought content is characterized by a paranoid symptomology. Although some of his behavior is a projection of reasonable fear within prison, Mr. Marshall reacts to future possible violence in his actions, i.e., burying a shank, assaulting individuals." (Id. at 2.)

As a result of his misconduct, Marshall spent over 13 years in solitary confinement, the majority of which was during his first decade in prison. (Pet'r's State Court Resentencing Transcript ("Pet'r's Resentencing Tr."), Pet'r's Ex. A (Docket No. 91-1), at 39.) His psychological examination in 1995 was conducted after he had recently spent 2.5 years in solitary confinement

for assaulting a guard and then had been returned to solitary for burying a shank.  (Med. Records at 2.)  Marshall was again released from solitary confinement in August 1996 but was sent back one month later for "threatening comments written on a request slip."  (Id. at 3.)  Marshall recognized the wrongfulness of his behavior, but "expresse[d] difficulty in controlling his actions." (See id.)  In August 1997, Marshall, upon his request, was admitted to a mental health unit for "major depression."  (Id. at 17.)  A medical record from that time reads: "[u]pon admission [to the mental health unit,] Mr. Marshall was observed to be despondent and sobbing.  He was believed to be suicidal at times.  Issues involved the sudden asthma death of his grandmother and early mid-life crisis (life sentence).  Poor hygiene was exhibited and neurovegetative symptoms were reported."  (Id. at 18.)  He was ultimately diagnosed with major depressive disorder.  (Id. at 6.)

        C.     Marshall's Federal Conviction

        In June of 1999, while Marshall was serving his LWOP sentence at the State Correctional Institute at Graterford, correctional officers found 250 feet of rope under Marshall's mattress and discovered one of the metal bars on his window had been cut away in what officials determined was an attempted escape.  (6/7/01 Guilty Plea Hr'g Tr. ("6/7/01 Hr'g Tr.") at 15.)  As a result, Marshall was again placed in solitary confinement, and all of his ingoing and outgoing mail was intercepted, copied, and read, leading authorities to discover a series of incriminating letters.  (Id.) These letters, which were between Marshall, his mother, and other individuals, led to a suspicion that Marshall was attempting to smuggle dynamite into prison in order to facilitate his escape.  (Id. at 15-17.)  On October 1, 1999, undercover agents met with Marshall's mother.  (Id. at 17.)  The agents, acting undercover, provided Marshall's mother with five sticks of sham dynamite and a handgun, and she acknowledged that she knew the items were to be used to free her son.  (Id. at

18.)  The next day, prison officials intercepted a letter from Marshall telling another individual to contact his mother to obtain the dynamite.  (Id.)

On June 29, 2000, Marshall and his mother were charged with conspiracy to receive explosives in violation of 18 U.S.C. § 844(n), "as part of a plan to cause the escape of [Marshall] from the custody of the Pennsylvania Department of Corrections."  (Indictment at 1.)  On June 7, 2001, Marshall pled guilty to this crime.  (6/7/01 Hr'g Tr. at 23.)[1]

    D.    <u>Marshall's Federal Sentence</u>

We sentenced Marshall on September 12, 2001.  In determining Marshall's sentence, we considered the sentencing recommendations of both the Probation Officer and the Government, the pre-sentence investigation report, the statutory maximum provided by 18 U.S.C. § 844(d), and the Sentencing Guidelines Range calculated pursuant to the 2000 edition of the United States Sentencing Guidelines.  Marshall had nine criminal history points, three of which arose from a 1990 conviction for "manufacture and delivery" of crack cocaine,[2] three of which arose from the murder conviction underlying the unconstitutional LWOP sentence, and three of which arose from a 1995 conviction for making a knife for another prisoner.  Marshall received an additional three points because he was imprisoned—serving his unconstitutional LWOP sentence—at the time he committed the explosives conspiracy.  We therefore assigned him a criminal history category of V.  This criminal history category, in combination with Marshall's calculated offense level of 25, resulted in a Sentencing Guidelines Range of 100-120 months, which at the time was a mandatory

---

[1] Marshall's mother pled not guilty and was acquitted by a jury on August 9, 2001.

[2] According to the Presentence Investigation Report, Marshall pled guilty to this crime, which involved his possession of 8 vials of crack cocaine, three weeks after the jury found him guilty of Ms. Richardson's murder.  (PSR ¶¶ 29-30.)

sentencing range.[3]  Although we knew at sentencing that Marshall had a lengthy disciplinary record, we did not know that he had spent years in solitary confinement.  We ultimately sentenced Marshall to a term of 110 months in prison, to be served consecutively to his state LWOP sentence.[4]

       E.     <u>Marshall's Post-Conviction Record</u>

Marshall stayed in state prison after we imposed our federal sentence to run consecutively to his state sentence.  His last misconduct was in or around 2010.  (Pet'r's Mem. at 23.)  He has taken college classes at Villanova and completed 15 self-improvement courses.  (<u>Id.</u> <u>see also</u> Marshall's Programming Records ("Program Records"), Pet'r's Ex. D (Docket No. 91-3), at 2, 4-8, 20-22 of 22.)  He has also "founded a book club and a performing arts program, facilitated courses on restorative justice . . . taught vocational skills," worked as a peer educator to assist "those seeking state parole," and served as an advocate for prison reform with groups including "Citizens United for the Rehabilitation of Errants (CURE), Books Through Bars, the Human Rights Coalition, Real Cost of Prisons, Decarcerate PA, and Prison Radio."  (Pet'r's Mem. at 23-24; <u>see also</u> Program Records at 20-22 of 22.)  In sum, he has become an advocate for change affecting lives both inside and outside of the prison.

---

[3] <u>See</u> <u>United States v. Booker</u>, 543 U.S. 220, 233 (2005) ("The Guidelines as written . . . are not advisory; they are mandatory and binding on all judges.").  It was not until 2005 that the Supreme Court held that the Guidelines' mandatory nature conflicted with the Sixth Amendment and that courts must therefore treat the Guidelines as advisory.  <u>See</u> <u>id.</u> at 265 ("We do not doubt that Congress, when it wrote the [Sentencing Reform Act of 1984], intended to create a form of mandatory Guidelines system.  But . . . given today's constitutional holding, that is not a choice that remains open." (citation omitted)).

[4] The 2000 edition of the Sentencing Guidelines provided that "[i]f the instant offense was committed while the defendant was serving a term of imprisonment . . . the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment."  U.S.S.G. § 5G1.3(a) (2001).  The current version of the Guidelines contains the same provision.  U.S.S.G. § 5G1.3(a) (2021).

F.    Marshall's State Court Order Vacating his State Sentence

In 2012, the Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Miller, 567 U.S. at 479 (citation omitted).  This is in part because "a child's character is not as well formed as an adult's, his traits are less fixed and his actions less likely to be evidence of irretrievabl[e] deprav[ity]." Id. at 471 (alterations in original) (quotations omitted).  In 2016, the Supreme Court found that "Miller announced a substantive rule that is retroactive in cases on collateral review." Montgomery, 577 U.S. at 206.  In light of these decisions, Marshall filed a Post-Conviction Relief Act ("PCRA") petition in Pennsylvania state court.  On May 17, 2018, Judge Jeffrey Minehart of the Court of Common Pleas of Philadelphia County granted the PCRA petition, vacated Marshall's LWOP sentence, and resentenced him to 29 years to life, in part due to his rehabilitation efforts, giving him immediate parole eligibility.  (Pet'r's Resentencing Tr. at 90-91.)  Marshall was paroled not long after, in 2020, but because of his federal sentence, he was transferred to the custody of the Federal Bureau of Prisons to serve his 110-month federal sentence instead of being released. (Pet'r's Mem. at 13.)

## II.    LEGAL STANDARD

A district court may not ordinarily modify a defendant's sentence after it has been imposed. See 18 U.S.C. § 3582(c); Dillon v. United States, 560 U.S. 817, 824 (2010).  However, the FSA provides for compassionate release, stating that we may reduce an inmate's term of imprisonment "after considering the factors set forth in section 3553(a)" if we find that "extraordinary and compelling reasons warrant . . . a reduction" and a "reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A); see also U.S.S.G. § 1B1.13.  Neither Congress nor the pertinent Sentencing Guideline, i.e., U.S.S.G. § 1B1.13,

defines the term "extraordinary and compelling," but the Sentencing Commission's commentary to § 1B1.13, provides that "extraordinary and compelling reasons" can include, inter alia, the defendant's age, family circumstances, serious medical condition, or "other reasons" as determined by the Director of the Bureau of Prisons.  U.S.S.G. § 1B1.13 cmt. n.1.

In ascertaining what is extraordinary and compelling, the United States Court of Appeals for the Third Circuit ("Third Circuit") has clarified that "[w]e look to dictionary definitions to determine the ordinary meaning of a word . . . with reference to its statutory text."  United States v. Andrews, 12 F.4th 255, 260 (3d Cir. 2021) (second alteration in original) (quoting Bonkowski v. Oberg Indus., Inc., 787 F.3d 190, 200 (3d Cir. 2015)).  "The word 'extraordinary' is commonly understood to mean 'going beyond what is usual, regular, or customary,' or 'exceptional to a very marked extent.'"  United States v. Somerville, 463 F. Supp. 3d 585, 595–96 (W.D. Pa. May 29, 2020) (quoting Extraordinary, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/extraordinary (last visited 2020)) (citation omitted).  "The word 'compelling' means 'forceful,' 'demanding attention," or "convincing.'"  Id. (quoting Compelling, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/compelling (last visited 2020)) (citation omitted).  "Thus, at a minimum, § 3582(c)(1)(A)(i) requires a justification for release that is both unusual (i.e., unique to the inmate, and beyond the ordinary hardship of prison) and significant (i.e., serious enough to make release appropriate)."  Id. at 596 (emphasis omitted).

We may also consider the Sentencing Commission's policy statement.  Andrews, 12 F.4th at 260.  District courts are not bound by the policy statement, but it nevertheless "sheds light on the meaning of extraordinary and compelling reasons."  Id. at 260.  In other words, "[t]he policy statement's descriptions of extraordinary and compelling circumstances can 'guide discretion

without being conclusive.'" <u>Id.</u> at 260 (quoting <u>United States v. Gunn</u>, 980 F.3d 1178, 1180 (7th Cir. 2020)).[5]

Within these parameters, the Third Circuit has held that "the duration of a lawfully imposed sentence" or "nonretroactive changes to the § 924(c) mandatory minimums" cannot create an extraordinary and compelling circumstance under the statute. <u>Id.</u> at 260-61. At the same time, it stated that both may be legitimate considerations at the next step of the analysis, i.e., when weighing the § 3553(a) factors after a prisoner successfully shows extraordinary and compelling circumstances. <u>Id.</u> at 261. Moreover, the court clearly stated that, in assessing what constitutes an extraordinary and compelling circumstance supporting compassionate release, "[district c]ourts wield considerable discretion . . . and we will not disturb a court's determination unless we are left with a 'definite and firm conviction that [it] committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'" <u>Id.</u> at 262 (quoting <u>United States v. Pawlowski</u>, 967 F.3d 327, 330 (3d Cir. 2020) (second alteration in original)).[6]

---

[5] Both parties argue that Congressional history supports their position with regard to the scope of our discretion and the meaning of "extraordinary and compelling" circumstances. (<u>See</u> Pet'r's Mem. at 14-16; Gov't's Resp. at 24-33.) However, "courts may look behind a statute only when the plain meaning produces 'a result that is not just unwise but is clearly absurd.'" <u>In re Visteon Corp.</u>, 612 F.3d 210, 220 (3d Cir. 2010) (quoting <u>United States v. Terlingo</u>, 327 F.3d 216, 221 (3d Cir. 2003)). Neither party argues that the statute's plain meaning is absurd. Thus, we decline to "allow [potentially] 'ambiguous legislative history to muddy clear statutory language.'" <u>Azar v. Allina Health Servs.</u>, 139 S. Ct. 1804, 1814 (2019) (quoting <u>Milner v. Dep't of Navy</u>, 562 U.S. 562, 572 (2011)).

[6] We reject the Government's contention that we have discretion when weighing the 3553(a) factors, but not when determining what constitutes an "extraordinary and compelling" circumstance. <u>Andrews</u>'s holding that we have broad discretion clearly applies to the stage of analyzing "extraordinary and compelling" circumstances and not the stage of analyzing the § 3553(a) factors. The court in <u>Andrews</u> examined *only* the district court's analysis on this first step and concluded that district courts "wield considerable discretion." <u>Andrews</u>, 12 F.4th at 262. In fact, the court could not have reviewed the district court's application of the 3553(a) sentencing factors, because the district court had only held that the petitioner had not shown "extraordinary and compelling" circumstances, and had not reached the question of whether the 3553(a) factors

### III.    DISCUSSION

Marshall asks that we use our discretion under the FSA to grant him compassionate release. He argues that we should find that the following factors rise to the level of an "extraordinary and compelling" circumstance warranting release: 1) his unconstitutional state sentence and time spent in solitary confinement (which he argues are "inextricably linked" to his federal sentence), combined with his "profound" rehabilitation, and 2) his medical conditions that exacerbate the risk that COVID-19 poses to him.  (12/15/21 Compassionate Release Hearing Transcript ("12/15/21 Hr'g Tr."), at 6.)  He also argues that the factors identified in 18 U.S.C. § 3553 counsel a reduction of his sentence.

> #### A.    Marshall's Unconstitutional State Sentence, Long-term Solitary Confinement, and Rehabilitation

Marshall asks us to release him from his federal sentence, reasoning that he has suffered great unconstitutional harms in connection with his unlawful state sentence, that his federal sentence was a byproduct of his unlawful state sentence as well as the damaging solitary confinement to which he was subjected during that sentence, and that his successful rehabilitative efforts have proven that he is worthy of release.  He urges us to exercise our discretion to determine that all of these circumstances together constitute extraordinary and compelling reasons for release under the FSA.

As noted above, Marshall was sentenced in state court for criminal conduct that he committed as a minor to a LWOP sentence that the Supreme Court later determined to be

---

counseled a sentencing reduction.  Id.  Finally, since Andrews, the Third Circuit has further emphasized that we have discretion when determining what constitutes an "extraordinary and compelling" circumstance.  See United States v. Claude, 16 F.4th 422, 425 (3d Cir. 2021) (confirming that a district court has discretion when determining what constitutes "extraordinary and compelling reasons").

unconstitutional.  In <u>Montgomery</u>, the Court specifically acknowledged that an LWOP sentence is "a punishment that the law cannot impose upon [a juvenile offender]."  <u>See</u> <u>Montgomery</u>, 577 U.S. at 209 (quotation omitted).  As the Supreme Court has also observed, "[l]ife in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope."  <u>Graham v. Florida</u>, 560 U.S. 48, 79 (2010).  It further noted that "[a] young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual."  <u>Id.</u>

Here, when he was serving his unconstitutional sentence, Marshall could only have believed that he was going to die in prison.  His medical records reflect the effects of that prospect on his mental health.  A 1997 medical report reads: "[u]pon admission [to the mental health unit] Mr. Marshall was observed to be despondent and sobbing.  He was believed to be suicidal at times. Issues involved . . . [his] early mid-life crisis (life sentence).  Poor hygiene was exhibited and neurovegetative symptoms were reported."  (Med. Records at 18.)  Part of his treatment included "individual therapy concerning issues of loss, powerlessness and hopelessness."  (<u>Id.</u>)  Dr. Gerald Cooke, a forensic psychologist who examined Marshall prior to his state resentencing hearing, testified that Marshall believed that because of his relative youth, which made him "vulnerable to being taken advantage of by other inmates," he had to act in a "super-aggressive manner" in order to "establish himself and not be prey."  (Pet'r's Resentencing Tr. at 28, 36; <u>id.</u> at 35 (noting that Marshall "was a vulnerable juvenile, essentially growing up or coming of age in the prison system").)  According to Dr. Cooke, who testified that the portion of the brain that controls judgment does not fully mature until the age of 25, Marshall "did what he felt he needed to do without . . . regard to consequences," which led to a variety of misconducts, both non-violent and

violent, for which he spent the majority of his first decade in prison in solitary confinement.   (Id. at 30, 35, 39.)

Marshall maintains that his long-term solitary confinement during his unconstitutional sentence is also an important factor to consider in assessing the "extraordinary and compelling" circumstances that warrant his release.  When asked how, if at all, Marshall's time in solitary was relevant "when assessing . . .  Marshall's disciplinary records in [his] federal case," Dr. Cooke testified that it was "important [from] a number of perspectives."  (Id. at 40.)  Dr. Cooke explained:

> Being in solitary means, obviously, the individual has minimal social contact.  And social contact is necessary for what we call reality testing.  It's hard for somebody in solitary to sometimes distinguish what's real and what's fantasy.  It's hard for them to distinguish what's inside themselves and what's out there, what's external. They become . . . fearful of social contact . . . . They tend to develop frustration, anger, rage and . . . [as] a result of solitary get involved in further misconducts.

(Id. at 40-41.)  The Third Circuit has also stated that solitary confinement "can cause severe and traumatic psychological damage, include anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity."  Palakovic v. Wetzel, 854 F.3d 209, 225 (3d Cir. 2017) (citing Williams v. Sec'y of the Pennsylvania Dep't of Corrs., 848 F.3d 549, 566-67 (3d Cir. 2017)); see also Porter v. Pennsylvania Dep't of Corrs., 974 F.3d 431, 441-42 (3d Cir. 2020) (same).

A review of Marshall's experience in solitary confinement confirms its negative effect on his mental health.  When Marshall entered prison, "[a] mental health evaluation prepared for the Philadelphia County Common Pleas Court on March 6, 1990, diagnosed [him] as suffering from an Antisocial Personality Disorder and gave him a poor prognosis."  (PSR ¶ 42.)  By 1995, Marshall had spent more than 2.5 years in solitary confinement and his condition appears to have worsened.  (See Med. Records at 2.)  He then spent almost the entirety of the next two years in solitary confinement.  (Id. at 3 (stating on 5/29/97 that contacts with Marshall since 7/7/95 had

taken place in the Restricted Housing Unit).)  Marshall was psychologically evaluated again in 1997 and diagnosed with "Major Depressive Disorder."  (Id. at 6.)  Marshall asserts that he was a "D code" at this time, which is the Pennsylvania Department of Corrections' classification for prisoners with the most serious mental health issues.[7]  (12/15/21 Hr'g Tr. at 20.)  In Palakovic, the Third Circuit held that a prisoner with mental illness ("Stability Rating D") who was subjected to long-term solitary confinement (multiple 30-day periods in solitary confinement) could state a cognizable Eighth Amendment claim on the basis of those facts.  854 F.3d at 234.  Marshall's case bears some similarities to Palakovic, in that he had the same mental health rating as that alleged in Palakovic and was held in solitary confinement for a significantly longer period of time than the prisoner in that case.

In spite of his unconstitutional sentence and psychologically damaging solitary confinement, Marshall emphasizes that he has made considerable rehabilitative efforts, which support his request for release.  Indeed, Marshall's record of rehabilitation—taking college courses, founding prison arts programs, assisting prisoners with parole hearings, teaching vocational skills, and becoming a prison reform advocate—is remarkable and praiseworthy.  He asserts that he has not committed a prison misconduct "of any kind in the last eleven years, and virtually none in the five years before that."  (Pet'r's Mem. at 23.)  At Marshall's state resentencing hearing, Judge Minehart sentenced him to 29 years-to-life, a sentence below the recommended

---

[7]  In 2013, the Department of Corrections defined a "Stability Rating of D" as an "indicat[ion] that the inmate has a mental health history and requires significant monitoring by the Psychiatric Review Team."  (Med. Records at 32; see also 12/15/21 Hr'g Tr. at 19-20 (defining then Department of Corrections' various mental health codes).)  In 2019, the Department of Corrections defined "D Roster" as someone who is "currently diagnosed with a [serious mental illness], [intellectual disability], credible functional impairment, or is [guilty but mentally ill]."  (Dep't of Corr.'s Access to Mental Health Care Policy Stmt, Pet'r's Ex. I (Docket No. 106-2), at 6.)  Major depressive disorder is defined as a "serious mental illness."  (Id. at 5, 8.)

minimum sentence of 35 years.  (Pet'r's Resentencing Tr. at 91); <u>Commonwealth v. Batts</u>, 163 A.3d 410, 457 (2017) (concluding that a "sentencing court should be guided by [18 Pa. Cons. Stat. Ann. § 1102.1(a),]" which identifies that the minimum term of imprisonment for an individual in Marshall's position as 35 years).  This lower sentence stemmed, in part, from Judge Minehart's recognition of Marshall's efforts towards rehabilitation.  (Pet'r's Resentencing Tr. at 90-91.) Furthermore, Marshall submitted 18 letters from community members attesting to his character. (<u>See</u> Pet'r's Character Letters, Pet'r's Ex. E (Docket Nos. 91-4 & 91-5).)  These letters speak to themes like Marshall's mentorship of others, empathy, and thorough rehabilitation.  (<u>Id.</u>)  The Supreme Court has previously observed that "[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity."  <u>Graham</u>, 560 U.S. at 73.  It is thus all the more notable that Marshall's rehabilitative efforts have demonstrated growth and maturity all while serving an unconstitutional LWOP sentence and expecting to die in prison.

It is self-evident that Marshall's situation is rare.  Of about 1.6 million individuals in the U.S. prison population in 2012, only about 2,000 were serving sentences that were deemed unconstitutional under <u>Miller</u>. Ashley Nellis, *Still life: America's Increasing Use of Life and Long-Term Sentences*, The Sentencing Project (May 3, 2017) 34 n.2, https://www.sentencingproject.org/wp-content/uploads/2017/05/Still-Life.pdf; *Total Correctional Population*, BUREAU OF JUDICIAL STATISTICS, https://bjs.ojp.gov/data/key-statistics. That small group is unique due not only to its size, but also because the Supreme Court held that states must address this constitutional harm with *retroactive* relief.  <u>See</u> <u>Montgomery</u>, 577 U.S. at 208-09.  Furthermore, Marshall suffered not just one, but possibly a second constitutional harm when the state placed him in solitary confinement for the majority of his first decade in prison. <u>See</u> <u>Palakovic</u>, 854 F.3d at 234.  Moreover, in the years since Marshall was subjected to his years-

long stints in solitary, the Pennsylvania Department of Corrections has changed its policies, such that it no longer places individuals with severe mental illnesses in solitary confinement absent "exceptional circumstances." (Pa. Dep't of Corrs. Settlement Agrmt in <u>Disability Rights Network of Pennsylvania v. Wetzel</u>, Civ. A. No. 13-635 (M.D. Pa. Mar. 11, 2013), Pet'r's Ex. H (Docket No. 106-1), at 12.) Thus, today, the Commonwealth would likely not place a prisoner with a mental health history similar to Marshall's into long-term solitary confinement. In spite of Marshall's treatment, which society now recognizes as terribly damaging, Marshall has managed to reform himself and become a role model in the prison community. It is therefore clear to us that Marshall's unconstitutional state sentence and long-term solitary confinement are indeed "unique to [him] and beyond the ordinary hardship of prison" and, together with his unusual and exceptional rehabilitation, are circumstances that are "extraordinary" within the meaning of that term in the FSA. <u>Somerville</u>, 463 F. Supp. 3d at 596 (citing *Extraordinary*, Merriam-Webster Dictionary).

Furthermore, based on the facts and law discussed above, we have no trouble concluding that Marshall was affected by his unconstitutional LWOP sentence and his long-term solitary confinement at a young age, and that these facts contributed to the criminal conduct that resulted in his federal sentence. We acknowledge that it is often difficult to show the psychological effects of a prison sentence or incarceration, much less to show how those psychological effects caused further wrongdoing. However, Marshall presents the unique case where, not only does the record buttress his claims, but so too does existing case law. <u>See</u> <u>Graham</u>, 560 U.S. at 79 (noting that young prisoners serving LWOP sentences often feel hopeless and have no incentive to better themselves); <u>Palakovic</u>, 854 F.3d at 225 (concluding that long-term solitary "can cause severe and traumatic psychological damage." (citing <u>Williams</u>, 848 F.3d at 566-67)).

We also emphasize that, after suffering the effects of one and possibly two constitutional harms, Marshall easily could have withdrawn from prison life or decided to vent his frustration by continuing to violate prison rules and harm others. Indeed, the Supreme Court predicted as much when it observed: that "[a] young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual." See Graham, 560 U.S. at 79. Instead, over time, Marshall has defied the Court's prediction and completely rehabilitated himself. It has been over twenty-two years since he committed his final, federal crime, and he is now a transformed 51-year-old teacher, role-model, and advocate for political reform both inside and outside of the prison. His efforts are commendable and praiseworthy. There can be little question that his remarkable efforts at rehabilitation, taken together with his unconstitutional state sentence and long-term solitary confinement, are "significant" circumstances that "demand[] attention" and support compassionate release. See Somerville, 463 F. Supp. 3d at 596 (citing 18 U.S.C. § 3582(c)(1)(A)(i)) (quoting *Compelling*, Merriam-Webster Dictionary). We therefore conclude that Marshall's extraordinary circumstances are also "compelling" circumstances within the meaning of that term in the FSA, and that, as a result, he has established an extraordinary and compelling reason for relief under the statute.

The Government nonetheless argues that federal relief for Marshall's circumstances is not appropriate because Marshall has already received relief through his state court resentencing. (Gov't's Resp. at 21 n.9.) However, its suggestion that the unconstitutional harms that Marshall suffered can only be remedied by adjustments to his state sentence is too restrictive and overlooks our discretion under the FSA. We cannot ignore the fact that although Marshall's federal crime was distinct from his state crime and gave rise to a separate and independent sentence, the federal crime was also a byproduct of his state confinement and the conditions that he experienced there.

Indeed, as Marshall's federal Indictment recognized, Marshall's federal crime was "part of a plan to cause [his] escape . . . from the custody of the Pennsylvania Department of Corrections," where we now know he was being subjected to conditions that had profound effects on his mental health. (Indictment at 1.)   Moreover, we based his federal sentence in large part on his criminal history points, which he received not only for his state murder conviction, but also for another state crime he committed while incarcerated on his unconstitutional state sentence and for committing his federal crime while serving that state sentence.   Accordingly, we cannot completely extricate Marshall's federal crime and sentence from his state sentence and the conditions of his confinement, and we disagree with the Government that we cannot exercise our discretion to consider that unconstitutional state sentence and Marshall's experiences during it in order to grant him federal relief in addition to the relief that he already received from the state.   Rather, we conclude that we have discretion under the FSA to address what the state court could not: whether Marshall's unconstitutional LWOP state sentence and his state conditions of confinement amount to extraordinary and compelling circumstances that can support relief from his *federal* sentence.

In sum, for all of the reasons we have stated, we confidently conclude that Marshall's unconstitutional state sentence, long-term solitary confinement, and significant rehabilitation are together an "extraordinary and compelling" circumstance under the FSA.

B.   Marshall's Risk Factors for COVID-19

Marshall also argues that his advanced age (50 years old), moderate asthma, and hypertension, in combination with the COVID-19 pandemic, either independently or collectively with the reasons above, is as "extraordinary and compelling" circumstance that supports his release.   As we have already determined that his unconstitutional sentence, solitary confinement, and rehabilitation are, together, an extraordinary and compelling reason for relief, it is not

necessary for Marshall also to establish that his medical condition and COVID support compassionate release.   Nevertheless, in the interest of completeness, we will address his medical arguments.

The Third Circuit has made clear that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."  United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020) (citation omitted); see also United States v. Roeder, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").  "Rather, Defendant must establish that the risks to him, in light of his individual medical conditions and other circumstances, are so extraordinary and compelling that we should release him . . . ."  United States v. Rodriguez, 468 F. Supp. 3d 681, 684 (E.D. Pa. 2020).

Marshall argues that his asthma, either on its own or collectively with his other risk factors for COVID-19, warrants his release.  According to the CDC, moderate to severe asthma increases the risk of complications from COVID-19.  See People with Certain Medical Conditions, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed Mar. 4, 2022).  Marshall was prescribed an asthma inhaler on May 5, 2021, to use not daily, but rather "as needed."  (Pet'r's Recent Medical Records ("Pet'r's Recent Med. Records"), (Docket No. 95) at 48 of 127.)  On May 14, 2021, he reported that "his asthma is well controlled on his current regimen."  (Id. at 14 of 127.)  According to the National Institutes of Health, asthma may be moderate when any of the following criteria exist: 1) daily exhibition of

symptoms, 2) multiple nighttime awakenings a month, 3) some limitation on normal activity, 4) impacted lung function, 5) more frequent and intense asthma exacerbations.  *Asthma Care Quick Reference Guide*, U.S. DEP'T HEALTH AND HUMAN SERVS., 5 (Sept. 2012), https://www.nhlbi.nih.gov/sites/default/files/media/docs/12-5075.pdf.     Marshall's medical records reflect that he uses an inhaler, but they do not reveal the frequency with which he experiences asthma symptoms.  Nor do they reflect that he is limited in any way by his asthma symptoms.  On the contrary, on May 14, 2021, Marshall himself told his physician that that his "asthma is well controlled."  (Pet'r's Recent Med. Records at 14 of 127.)   In sum, the records do not provide support for a conclusion that Marshall suffers from any of the issues associated with "moderate" Asthma as articulated by the National Institutes of Health.  Accordingly, based on the record presented, we find that his asthma is not a risk factor for COVID-19 that warrants compassionate release, either on its own or together with his other alleged risk factors.  Accord United States v. Daniels, Crim. A. No. 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) (denying motion for compassionate release brought by inmate with asthma who uses an inhaler because, while the inmate "uses an inhaler, his asthma appears under control").

Marshall next asserts that his hypertension, either on its own or collectively with his other alleged risk factors for COVID-19, warrants his release.  According to the CDC, hypertension may increase the risk of complications from COVID-19.  See People with Certain Medical Conditions, CDC.  As we do not consider Marshall's asthma a risk factor, hypertension becomes Marshall's only possible basis for compassionate release on medical grounds.  However, "many courts have denied relief when hypertension is the only potential risk factor presented."  United States v. Tommaso, Civ. A. No. 15-602, 2021 WL 4941490, at *3 (E.D. Pa. Oct. 22, 2021) (collecting cases); see also United States v. Phillips, Crim. A. No. 07-549, 2020 WL 2346101, at *7 (E.D. Pa.

Jun. 8, 2021) (holding that a prisoner with "well-controlled" obesity and hypertension did not present extraordinary and compelling circumstances). Marshall is also vaccinated. (Pet'r's Recent Med. Records at 115 of 127.) While breakthrough infections are not uncommon, especially with the Omicron variant of COVID-19, current vaccines are still effective and prevent most severe illness and hospitalization due to the disease. *Omicron Variant: What You Need to Know*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (accessed Mar. 4, 2021); David Leonhardt & Ashley Wu, *A Growing Gap*, N.Y. TIMES (Jan. 11, 2022), https://www.nytimes.com/2022/01/11/briefing/omicron-deaths-vaccinated-vs-unvaccinated.html. Finally, Marshall is incarcerated at FCI Williamsburg in South Carolina, and asks us to consider South Carolina's low COVID-19 vaccination rates as posing him a unique risk. However, even if we assume that breakthrough infections are more common in a state with lower vaccination rates, Marshall's vaccination lowers his risk of complications from COVID-19 that stem from his hypertension. As a result, we find that Marshall's hypertension cannot support a finding of an "extraordinary and compelling" circumstance. Accordingly, we reject Marshall's argument that his medical conditions and COVID-19 are an "extraordinary and compelling" circumstance warranting his release.

## III.    Conclusion

Having determined that Marshall's unconstitutional state sentence, long-term solitary confinement, and significant efforts towards rehabilitation together amount to an "extraordinary and compelling" reason warranting relief under the FSA, we must now "consider[] the factors set forth in section § 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). However, the Government did not address the § 3553(a) factors either in its response to Marshall's Motion or at oral argument. Moreover, while Marshall requests that we sentence him to time

served (see 12/15/21 Hr'g Tr. at 8), we "have no obligation to reduce the sentence in a way that provides immediate release from prison" and could instead opt for a limited downward adjustment to Marshall's sentence.  United States v. Clausen, Crim. A. No. 00-291, 2020 WL 4260795, at *8 (E.D. Pa. Jul. 24, 2020) (citing United States v. Young, 458 F. Supp. 3d 838, 849 (M.D. Tenn. 2020), and United States v. Maumau, Crim. A. No. 08-758, 2020 WL 806121, at *8 (D. Utah Feb. 18, 2020), aff'd, 993 F.3d 821 (10th Cir. 2021)); see also Somerville, 463 F. Supp. 3d at 606 (modifying a remaining term of imprisonment to 36 months' probation).  We will therefore schedule a hearing for the purpose of fully considering the relevant § 3553(a) factors and determining an appropriate sentence modification.  An appropriate Order follows.

BY THE COURT:

s/ John R. Padova_____
John R. Padova, J.